IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

EMON V. HOLLINS,

                Plaintiff,

    v.                                                                              OPINION and ORDER

LT. WALLER, C.O. OLIG, C.O. SWINGEN,                          17-cv-757-jdp
C.O. STANDISH, and J. MUENCHOW,

                Defendants.

---

Plaintiff Emon V. Hollins, appearing pro se, alleges that defendant prison officials violated his rights by keeping him in an unsanitary cell smelling strongly of feces and urine and failing to take action to clean an adjacent cell in which a prisoner had smeared waste. Defendants have filed a motion for summary judgment, contending that Hollins could have cleaned his cell himself, and that they appropriately responded to the neighboring inmate's actions. I conclude that there are genuine disputes of material facts about these issues, so I will deny defendants' motion for summary judgment regarding most of the defendants.

UNDISPUTED FACTS

The following facts are undisputed unless noted otherwise. Plaintiff Emon V. Hollins is a prisoner housed at Waupun Correctional Institution (WCI). At the times relevant to this case, all of the defendants worked at WCI: Shane Waller was a supervising officer. Todd Olig, Trevor Standish, and Zachary Swingen were correctional officers. James Muenchow was an institution complaint examiner.

On occasion, inmates leave blood, feces, urine, food, or other material in their cells, particularly in the segregation cells at issue in this case. Defendants say that when an inmate

is removed from a cell, that cell is cleaned and inspected before any other inmate is placed in the cell. Cells are usually cleaned by inmate workers, typically referred to as "swampers," and then inspected by the security staff. Typically, cells are cleaned with cleaning solutions, scrub pads, and mops. If those methods are not enough, or if the cell contains fecal matter, the cell is cleaned with a pressure washer. Hollins says that prison staff often do not ensure that cells are cleaned when inmates are switched.

Inmates are generally given the opportunity to clean their cells in the segregation unit twice a week. Inmates are provided with a mop, broom, toilet bowl cleaner, toilet brush, rag, and scrub pad. A mop bucket containing hot water and a cleaning solution is brought around to each cell. Defendants say that if an inmate wants cleaning supplies outside of the designated days, unit staff will provide the inmate with the cleaning supplies they request unless the inmate presents a safety threat to themselves or others. Hollins says that staff usually refuse any off-schedule requests.

On July 9, 2015, Hollins was placed in segregation cell A-222. Hollins could smell feces as he walked down the range hallway. Hollins says that after he was in his cell and his handcuffs were removed, he told defendant Olig that his cell smelled like urine and feces. Hollins noticed streaks of brown particles on his cell's trap, which he believes was feces. Defendants say that the streaks could have been rust.

Hollins asked to be placed in a different cell. He says that Olig told him that the entire range had the odor problem, and that Olig could not move Hollins to a new cell. Once Olig left, Hollins sniffed the brown particles on his trap and he almost gagged at the smell of the feces. He then began to develop a headache. After inspecting his cell; Hollins discovered dried

urine and food particles on the walls and cell door. Olig says that he does not remember Hollins complaining about his cell.

Over the next few days, Hollins asked defendants Olig, Swingen, and Standish to move him to a different cell, or give him some cleaning supplies; they all refused. Swingen eventually gave Hollins a rag and shampoo, and he told Hollins that he could not give him anything else. The shampoo Swingen gave Hollins was not effective in cleaning the cell or removing the urine and feces smell. Hollins also says that he "used the cleaning supplies [he] was given, but it did not remedy the smell of feces and urine." Dkt. 55, at 3, ¶ 25. By this I take Hollins to be saying that the cleaning supplies provided twice weekly did not work either. Hollins told Olig, Swingen, and Standish that the supplies did not work, but they did not inspect the cell, move him, or pressure wash the cell.

Hollins says that the conditions of his cell were exacerbated by the actions of another inmate, Tyrone Carr who was housed in cell A-223. Carr smeared feces on himself and in his cell and urinated on his cell door. The parties dispute whether Carr also urinated out of the trap. Carr also refused to shower or change his clothes. Hollins says that defendants did nothing to clean Carr or his cell for about 10 to 14 days. Defendants say that at some point, they persuaded Carr to take a shower, and that Carr's cell was cleaned with bleach. Hollins says that after this, the hallway no longer smelled, but his cell still did.

On about July 14, 2015, Hollins submitted an "Interview/Information Request" form stating that the A-range smelled of feces and urine and that there was feces on his trap. I take defendants to be saying that defendant Waller would usually respond to this type of request, but that he did not work the week that Hollins submitted it. Waller did respond much later,

3

on August 20, stating that staff "are always looking to remedy any sanitation issues" and that cells are cleaned before they are occupied. Dkt. 49-2.

Waller says that he was already aware of Hollins's complaint because Hollins followed the information request with a formal inmate grievance about the problem on July 23. Defendant institution complaint examiner James Muenchow contacted Waller and Waller told him that Hollins should contact Waller with any requests or issues he had regarding his cell conditions. Muenchow told Hollins to talk to Waller. Other than the August 20 response by Waller, neither side explains whether Hollins and Waller had any further communications.

Hollins spent 46 days in cell A-222. Because of the odor, he suffered dizziness and headaches and he had trouble sleeping.

ANALYSIS

Hollins contends that defendants violated his Eighth Amendment right against cruel and unusual punishment by consciously disregarding the conditions of his confinement. In particular, Hollins alleges that he was forced to live in in an unsanitary cell smelling strongly of feces and urine.

To succeed on their summary judgment motion, defendants must show that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). All reasonable inferences from the facts in the summary judgment record must

4

be drawn in Hollins's favor because he is the non-moving party. *Baron v. City of Highland Park*, 195 F.3d 333, 338 (7th Cir. 1999).

Under the Eighth Amendment, prisoners are guaranteed humane conditions of confinement for their health and safety. *Rice ex rel. Rice v. Corr. Med. Serv's*, 675 F.3d 650, 664 (7th Cir. 2012) ("Incarcerated persons are entitled to confinement under humane conditions which provide for their 'basic human needs.'"). For example, prisoners must receive adequate food, clothing, and shelter, *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), including sanitary conditions of confinement, *see, e.g.*, *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) ("exposure to human waste carries particular weight in the conditions calculus"); *Fruit v. Norris*, 905 F.2d 1147, 1151 (8th Cir. 1990) ("courts have been especially cautious about condoning conditions that include an inmate's proximity to human waste"). To prevail on a conditions-of-confinement claim, a prisoner must prove two things: (1) the adverse condition is sufficiently serious; and (2) the prison official consciously disregarded that condition. *Rice*, 675 F.3d at 664–65. The parties dispute both elements.

**A. Seriousness of conditions**

For an adverse condition to be sufficiently serious, it must be "extreme," *Hudson v. McMillian*, 503 U.S. 1, 9 (1992), and it must deprive the prisoner of a "minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Hollins states that he was forced to live in unsanitary conditions, both from urine and feces in his cell and the cell next door, and that the conditions were bad enough that he suffered dizziness and headaches and he had trouble sleeping. The severity of the conditions as alleged by Hollins would ordinarily be serious enough to meet this element.

But defendants contend that the conditions were not serious enough to violate the Constitution because Hollins had the opportunity to clean his cell twice a week and he chose not to. Hollins did not dispute that the supplies are available twice a week, and defendants argue that Hollins fails to explain whether he used those supplies or why he thinks that they were ineffective. But in his response materials, Hollins does say, albeit perfunctorily, that he "used the cleaning supplies [he] was given, but it did not remedy the smell of feces and urine." Dkt. 55, at 3, ¶ 25. I take defendants to be saying that Hollins is referring to the shampoo he was given by Swingen early in Hollins's stay in the cell, not the twice-weekly supplies. But in his brief, Hollins says that he is referring to the twice-weekly supplies. The question whether Hollins actually tried to clean his cell is a question of fact for the jury. At the summary judgment stage, I will credit Hollins's version.

Defendants also contend that the foul smell coming from Carr's cell is not enough to violate the Constitution because the problem here was not as severe as the problems in other cases involving poor ventilation. They cite *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008), a case in which the court concluded that a foul odor coming from the plumbing was not enough to support a conditions-of-confinement claim, contrasting Sain's allegations with those in *Board v. Farnham*, 394 F.3d 469 (7th Cir. 2005), a case in which a prisoner suffered severe nosebleeds and respiratory problems from toxic mold in air ducts. I agree with defendants that the Constitution does not guarantee prisoners to be completely free from objectionable odors, but here, Hollins says that the odor made him dizzy, gave him headaches, and caused him to have trouble sleeping, which goes well beyond mere unpleasantness and makes this case closer to *Board* than *Sain*. *See also Marshall v. Salter*, No. 07-cv-715-bbc, 2008 WL 2622860, at *6 (W.D. Wis. July 1, 2008) (concluding that odors from urine and feces could violate Eighth

Amendment where they caused plaintiff to become ill). Defendants argue that Hollins does not have the medical training to testify about the causes of his medical problems. I conclude that Hollins doesn't need to be a medical professional to explain how the smell affected him; I will credit his layperson testimony about his symptoms, which were severe enough to raise a dispute of material fact about the severity of the problem.

**B. Conscious disregard**

    **1. Defendants Swingen, Olig, and Standish**

To prevail on an Eighth Amendment claim, Hollins must show not only that defendants were aware of the problem, but that they consciously disregarded it. *Rice*, 675 F.3d at 665. Hollins says that he told defendant officers Swingen, Olig, and Standish about the presence of feces and urine and the smell from both his cell and Carr's cell, but they didn't move him to a different cell or power wash the cell even after Hollins told them that the normal cleaning supplies didn't solve the problem. In the conscious disregard portion of their brief in chief, defendants do not directly address these officers' responses to the allegations about the feces and urine in Hollins's cell. I take their position to be that the officers did not consciously disregard the problem because cleaning supplies were available to Hollins. But I've addressed that argument already; Hollins says that the provided supplies didn't work and that defendants knew that. Hollins has provided proposed findings of fact sufficient to create a factual dispute about these defendants' response to the problem.

Defendants instead focus on the aspect of Hollins's claims regarding the smell from Carr's cell: they contend that inmates smearing urine and feces is simply an unfortunate incident of prison life and other inmates cannot bring Eighth Amendment claims against correctional officers when the officers do what they can to remedy the problem. They rely on

7

*Marshall*, 2008 WL 2622860, a previous case from this district, in which the court granted summary judgment on an inmate's claim about the smell coming from another prisoner's cell, because the officers acted reasonably to the prisoner's disruptive behavior. *Id.* at *6 ("In this case, it was not unreasonable for prison staff to remove the prisoners from their cells as quickly as possible after they defecated or urinated, and power wash and disinfect the cells. It is possible that some odor lingered even after these steps were taken, but the fact that the clean-up effort could not remove the odor entirely does not make the approach itself unreasonable. In fact, it is difficult to imagine what else prison officials could have done when faced with handling other prisoners bent on engaging in disgusting and disruptive behaviors.") (citation omitted).

I agree with the premise that prison administration is difficult and it is not possible to completely stop prisoners from smearing feces or splashing urine in their cells. Other inmates might be subjected to the foul odors resulting from other inmates' actions. But the ultimate question from the Eighth Amendment perspective is how officials respond to these types of incidents. Hollins says that defendants waited 10 to 14 days to do something about Carr smearing feces on himself and his cell. Defendants say that they persuaded Carr to take a shower and they had the cell cleaned with bleach, but they do not explain *when* they took those actions. If they dawdled in taking those steps as long as Hollins says they did, then a reasonable jury could conclude that they consciously disregarded the harm to nearby prisoners.

   2. **Defendants Muenchow and Waller**

Defendant Muenchow reviewed Hollins's inmate grievance about the odor in his cell. Muenchow responded by stating that the problem was caused by other inmates (presumably including Carr), that defendant Waller "had been contacted," and that Hollins should send further concerns to Waller. That is all that Muenchow was required to do. He addressed the

8

problem by placing the issue in Waller's hands, so there is no reason to think that Muenchow consciously disregarded the problem. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (Claim against complaint examiner fails where prisoner "has not accused [examiner] of refusing to do her job and of leaving the prisoners to face risks that could be averted by faithful implementation of the grievance machinery. He contends, instead, that [examiner] should be held liable because she carried out her job exactly as she was supposed to."). I will grant defendants summary judgment on the claim against Muenchow.

As for defendant Waller, he was made aware of the odor problem from Hollins's information request and from Muenchow referring the grievance to him. Waller responded to Hollins's information request by staying that staff was "always looking to remedy any sanitation issue," Dkt. 49-2, but there is no indication that he took any action to help Hollins. Nor is there any indication that he responded directly to Hollins's grievance. So a reasonable jury could conclude that Waller consciously disregarded the problem.

### 3. Qualified immunity

Defendants contend that even if there are genuine factual disputes concerning Hollins's claims, they are entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Put a bit more bluntly, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). A right is "clearly established" when a reasonable official would know that his "conduct

9

was unlawful in the situation he confronted." *Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 915 (7th Cir. 2011) (citations omitted).

Defendants say that they are entitled to qualified immunity because they are unaware of any case law suggesting that prison staff violates the Eighth Amendment when an inmate has access to cleaning supplies and "defendants made every effort to remedy the situation created by a disruptive inmate in the unit." Dkt. 44, at 16. But as I discuss above, there are disputed issues of material fact over whether Hollins had access to *adequate* cleaning supplies and whether defendants dawdled in attempting to clean Carr and Carr's cell.

Hollins's version of events fits within existing precedent saying that keeping a prisoner in a cell containing human waste may violate the prisoner's Eighth Amendment rights. *See, e.g.*, *Vinning-El v. Long*, 482 F.3d 923 (7th Cir. 2007); *Isby v. Clark*, 100 F.3d 502 (7th Cir. 1996). So I will deny defendants' motion for summary judgment on Hollins's claims against defendants Swingen, Olig, Standish, and Waller, and the case will proceed to trial on those claims. I will follow this order with a "trial preparation order" that will include specific instructions about how Hollins should present his claims at trial.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 43, is GRANTED in part and DENIED in part as stated in the opinion above.

2. Defendant Muenchow is DISMISSED from the case.

Entered November 8, 2019.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge